IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

CASE NO.: 9:14-CV-80666-Hurley/Hopkins

LEXISNEXIS RISK SOLUTIONS FL INC.,

   Plaintiff,

v.

JACQUELYN SPIEGEL,

   Defendant.
_____/

### AMENDED VERIFIED COMPLAINT FOR PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF AND ATTORNEYS' FEES

LexisNexis Risk Solutions FL Inc., a Minnesota corporation ("LNRS" or the "Company" or "Plaintiff"), by and through its undersigned counsel, hereby files this Amended Verified Complaint, in which it seeks preliminary and permanent injunctive relief and attorneys' fees against Defendant Jacquelyn Spiegel ("Spiegel" or "Defendant") to enforce the terms of a Confidentiality, Nondisclosure, and Noncompetition Agreement dated March 3, 2003, stating as follows:

### I.   PARTIES, JURISDICTION, AND VENUE

1. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a), as the parties are of diverse citizenship and the amount in controversy exceeds $75,000, exclusive of interest and costs, in that the value of the injunctive relief sought, and the profits and goodwill that LNRS stands to lose in the absence of injunctive relief sought, have a value far exceeding the $75,000 threshold for this Court's jurisdiction. Additionally, LNRS

1

seeks attorneys' fees pursuant to the fee-shifting provision in the agreement at issue between the parties, and LNRS's attorneys' fees in this action are anticipated to exceed $75,000.

2. Spiegel is an individual person over 18 years of age and is currently, and was during her employment with LNRS, a resident of Broward County, Florida. Beginning on or about March 3, 2003, Spiegel became employed by Seisint Inc. ("Seisint"), which subsequently was acquired by a parent corporation of LNRS in September 2004. Spiegel later became employed by LNRS and continued working in the Boca Raton, Florida office until she resigned on May 9, 2014. For purposes of this Complaint, "LNRS" or the "Company" shall include Seisint and all corporate successor entities and affiliates unless otherwise indicated.

3. LNRS is a Minnesota corporation with its principal place of business located in Alpharetta, Georgia. LNRS and its corporate parents and affiliates maintain business operations throughout the world. Throughout Spiegel's employment with the Company, LNRS maintained significant business operations in Boca Raton.

4. LNRS and Spiegel are parties to a written "Confidentiality, Nondisclosure, and Noncompetition Agreement" (the "Agreement") dated March 3, 2003. A true and correct copy of the Agreement is attached hereto as Exhibit A and is incorporated herein by reference.

5. On April 4, 2014, Spiegel notified LNRS via email that she had been offered a position as Product Manager with TLO/TransUnion, one of LNRS's direct competitors. On April 7, 2014, LNRS responded to Spiegel via e-mail, notifying her that accepting that offer would constitute a violation of the Agreement.

6. On May 9, 2014, Spiegel resigned from her position with LNRS. Upon information and belief, Spiegel has accepted the Product Manager position with TLO/TransUnion and will be assigned to TLO/TransUnion's office in Boca Raton, Florida.

7. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because Spiegel is a resident of Broward County, Florida and a substantial part of the events or omissions giving rise to LNRS's claims occurred in this District. Additionally, Paragraph 17 of the Agreement contains a mandatory forum selection clause which provides that the "forum for contests of this Agreement shall only be in Palm Beach County, Florida." (Ex. A ¶ 17).

## II. GENERAL FACTUAL ALLEGATIONS

### A. The Business Of LNRS

8. LNRS is a leading global provider of content-enabled risk management solutions. It uses cutting-edge technology, unique data, and advanced techniques to help customers across numerous industries and government predict, assess, and manage risk associated with people with whom they do business (hereinafter the "Business").

9. Included within the Business of LNRS are several lines of risk analytics services grouped according to business need, including but not limited to: underwriting and fraud detection for the Insurance industry; investigation and prevention of identity fraud and other activity for the Financial Services industry; revenue protection, operational efficiency, and fraud prevention for the Retail industry; debtor location and collection efficiency for the Collections industry; witness location, asset assessment, and prospective client diligence for the Legal industry; location of missing persons and suspects, fraud reduction, and revenue acceleration for the Government; and verification of patient identity, eligibility, and ability to pay and fraud prevention and investigation for the Health Care industry.

10. LNRS serves customers all over the world. Its market in the United States consists of commercial organizations and governmental agencies in each and every state in the

nation. Indeed, LNRS's customers and potential customers are located everywhere that businesses need services described above in connection with the Business.

11. LNRS operates in an industry that is highly competitive. There are dozens of providers that offer solutions aimed at meeting the types of business needs that LNRS serves. Competitive advantage in the industry is gained or lost according to the relative effectiveness and innovation of a given product, strategic marketing, pricing, relationships with key customers and suppliers, and various other factors. Maintaining the confidentiality of such innovations, strategies, proprietary information, and relationships is vitally important to the survival of competitors in this industry.

12. The business solutions offered by LNRS are based on proprietary methods, techniques, and processes for acquiring, analyzing, and utilizing data and information from numerous sources. LNRS has invested substantial resources, including but not limited to money, time, effort, and expertise, in the development of these methods, techniques, and processes.

13. A key LNRS product is Accurint, which provides online access and analysis of public record and related information within various segments of the Business. In connection with this product, LNRS has developed leading data technologies for acquiring, processing, linking and querying large data sets which deliver both product and cost leadership in its markets. The superior technology behind the Accurint product allows customers to compile, retrieve and analyze data quickly, accurately and cost-effectively.

B. **Spiegel's Employment With LNRS**

14. Throughout her employment with LNRS, Spiegel was privy to and had access to vital proprietary and confidential information regarding LNRS and its various product offerings.

4

Over the course of her career she gained a deep working knowledge of LNRS's methods, techniques, and processes on a data level, on a product level, and on a company level.

15. One of Spiegel's key functions throughout her employment with LNRS was to develop "competitive intelligence" and provide analysis to the marketing and sales, product design, and engineering teams. This included researching, monitoring, and assessing products sold by LNRS's competitors, compiling and analyzing information regarding the strengths and weaknesses of LNRS's products vis-à-vis the competition, and communicating that analysis to the LNRS sales and marketing, product development, and engineering teams so they could maintain or improve the Company's competitive position and develop new business.

16. Spiegel's duties involved not only compiling and analyzing information regarding competitors' products, but also gaining deep and detailed knowledge and insight regarding LNRS products. Indeed, one of the main purposes of competitive intelligence was to maintain and improve the Company's understanding of what LNRS was doing differently from its competitors and how such differences gave its products advantages, disadvantages, opportunities, and vulnerabilities. In light of these duties, Spiegel was privy to a wide array of extremely sensitive, confidential, and proprietary information regarding LNRS's products and how they compared with the competition.

17. For example, Spiegel gained knowledge regarding LNRS vendors that provide the most useful data sets, which data sets and respective components tend to yield the best results within LNRS products, how the data are tested and evaluated for LNRS products, and how various data components fit within the unique methods, techniques, and processes used by LNRS to deliver the most effective results.

18. Spiegel also focused especially on LNRS phone-related data and products. As part of her role with LNRS, Spiegel worked extensively to identify the best vendors for phone-related data, to identify the most effective data from such vendors, to test and evaluate such data, and to assist in the communication of such research and analysis to the LNRS product design and engineering teams for enhancement or improvement of such products. Her special knowledge in this particular area involves highly confidential and proprietary information developed and owned and protected by LNRS.

19. The information and analysis compiled and communicated by Spiegel as part of "competitive intelligence" benefited LNRS in virtually all of its lines of business. This is because LNRS products, including Accurint, are used by customers in so many industries. Although Spiegel worked most closely with the LNRS Collections business, her work was relevant to and was used widely among other LNRS businesses, including but not limited to Insurance, Financial Services, Retail, and Health Care.

20. Spiegel's detailed knowledge regarding not only the products offered by LNRS competitors but also the proprietary and confidential workings within LNRS were developed at substantial expense to LNRS and were acquired by Spiegel as a result of her position of trust within LNRS for more than a decade. Such knowledge would be tremendously valuable to a competitor because it could substantially undermine the value of competitive advantages that LNRS has built up through decades of costly research and development.

C. **The Agreement Between Spiegel and LNRS**

21. Under the Agreement executed in March 2003, Spiegel agreed to certain post-employment restrictive covenants, including: (1) a non-disclosure covenant (not to use, disclose, or reveal to any person or entity any confidential information, including trade secrets); and (2) a

two-year non-competition covenant (not to become employed by any company within the continental United States that engaged in a business that is the same or similar to LNRS's business at the time of signing or to any other type of business that may be conducted at any time during the course of her employment).

22. The Agreement expressly states that it "shall be binding on, and shall inure to the benefit of, the parties to it and their respective legal representatives, successors and assigns." (Ex. A ¶ 19). Thus, although Spiegel signed the Agreement with Seisint, LNRS has the right to enforce its provisions as a successor and assign.

23. The non-disclosure covenant in the Agreement provides that:

> [Spiegel] shall, indefinitely, hold any Confidential Information in the strictest confidence and will not disclose any Subject Information [defined as Confidential Information, Trade Secrets (also defined in the Agreement), or other proprietary information] to any person or entity whatsoever, absent prior, express written instruction, signed by the president or chief executive officer of [Seisint or its successor]. [Spiegel] shall take all steps necessary to ensure that any Confidential Information is held in the strictest confidence and that the terms and conditions of this Agreement are strictly adhered to by [Spiegel]. . . . [Spiegel] further agrees to indemnify [Seisint or its successor] against any loss or liability resulting from, or arising in connection with, unauthorized use or disclosure of the Confidential Information by [Spiegel] or [her] representatives.

(*Id.* ¶ 6.)

24. The non-competition covenant in the Agreement specifically provides that, for a period of two years following the end of her employment, Spiegel will not:

> [E]ither as principal, agent, employee, employer, stockholder, copartner or in any other individual or representative capacity whatsoever, engage in a business in the continental United States that is the same or similar to [Seisint's highly confidential business] Venture, including but not limited to "Internet" or other electronic media ventures, as well as other computer hardware, software or programming ventures, businesses, partnerships, proprietorships, enterprises or corporations, or any other type of business which now or later may in the course of Individual's relationship with Corporation be conducted by the Parties . . . .

(*Id.* ¶ 11).[1]

25. In support of the non-competition covenant, Spiegel acknowledged:

> Further, [Spiegel] represents and admits that in the event of the termination of the relationship between the parties, [her] experiences and capabilities are such that [she] can obtain employment in business or other lines of work and/or of a different nature, and that the enforcement of a remedy by way of injunction will not prevent [her] from earning a livelihood.

(*Id.*).

26. LNRS has legitimate business interests in preventing Spiegel from engaging in direct competition within the territories where she performed work for LNRS during her employment and where LNRS conducts business. *See* Fla. Stat. § 542.335.

27. In the Agreement, Spiegel expressly recognized that "irreparable injury will result to [LNRS] in the event of a breach of this Agreement by Spiegel." (Ex. A ¶ 11). The Agreement also provides for recovery of attorney's fees in connection with an action to construe or enforce any provision of the Agreement. (*Id.*, ¶ 25.)

**D.  LNRS's Legitimate Business Interests**

28. LNRS has legitimate business interests, as recognized in Fla. Stat. § 542.335, that justify the enforcement of the non-competition covenant in the Agreement, including but not limited to the following: preserving its confidential information, including but not limited to trade secrets; maintaining the substantial relationships it has with its customers; maintaining the goodwill it has developed at great expense and effort; and preserving benefits achieved through extraordinary or specialized training provided to its employees.

29. LNRS has developed valuable confidential information, including but not limited to trade secrets, through significant expenditure of money, time, and other resources. LNRS has

---

[1] When the Agreement was executed, Seisint's data business was in its early stages of development; due to its innovative and highly confidential nature, it was referred to in the Agreement simply as the "Venture."

8

a legitimate business interest in its confidential information, including but not limited to trade secrets, which justifies enforcement of the Agreement.

30. Some or all of the LNRS confidential information constitutes trade secret information in whole or in part under applicable law because: it derives economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and it is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

31. LNRS's confidential information, including but not limited to trade secret information, gives LNRS a competitive advantage over its competitors. Disclosure to a competitor or use by a competitor of some or all of LNRS's confidential information, including but not limited to trade secrets, would seriously diminish its competitive advantage, and would cause serious and irreparable harm to its business.

32. By virtue of her employment with LNRS, Spiegel had substantial access to, gained expansive knowledge of, and was actively engaged in the use and continued development of, LNRS's valuable confidential information, including but not limited to trade secrets. Such information includes, among other things: confidential and proprietary reports and analyses regarding the strengths, weaknesses, opportunities, and vulnerabilities of LNRS products, as well as confidential and proprietary reports and analyses regarding its competitors' products.

33. In particular, throughout her employment with LNRS, Spiegel was engaged in data-related competitive intelligence work across various products and services, including but not limited to LNRS's Accurint product, with which TLO/TransUnion's products directly compete. In addition, Spiegel worked extensively with LNRS phone products and she gained

9

intimate knowledge of confidential and proprietary information regarding the sources and characteristics of data used in those products.

34. Additionally, Spiegel's work for LNRS and regular exposure to confidential and proprietary information gave her unique insight into the investments that LNRS has made in selecting the most effective data content providers, identifying which data sets to acquire, and developing methods, techniques, and processes for testing, analyzing, and adding value to the data it collects.

35. Throughout the course of her employment with LNRS, Spiegel worked with individuals in numerous locations around the country. She performed functions that affected the sale of LNRS products in almost every city throughout the United States and Canada. Given the nature of LNRS's products, which are sold and utilized electronically through the Internet, Spiegel's work at LNRS was nationwide.

36. Because its stock in trade consists of data and information, because its success depends on how such materials are acquired, analyzed, and utilized, and because it desires to protect its confidential information and trade secrets, LNRS has taken a number of reasonable steps to preserve and protect its confidential information and trade secrets, including but not limited to: adoption of various policies, procedures, and safeguards to avoid disclosure; requiring data encryption of communications outside of LNRS's equipment and electronic communications networks; regulating access to information via password-required access to LNRS's equipment and electronic communications networks; providing such information only to those employees with a need for the information; and requiring employees with access to confidential information to execute restrictive non-disclosure and non-compete covenants.

37.  Spiegel's knowledge, developed through the substantial investment by LNRS of time, money, and other resources over the course of more than a decade, would be tremendously valuable to TLO/TransUnion, which is one of LNRS's direct competitors, and could virtually erase competitive advantages that LNRS has worked so hard to develop.

38.  In addition, LNRS has invested substantial resources providing extraordinary and specialized training to Spiegel with respect to numerous aspects of LNRS's business, including but not limited to detailed instruction and education on LNRS's products, methods, techniques, processes, business strategies, and various other subjects needed in order to develop, operate, manage, market, and sell LNRS's services throughout the United States.

### E. Spiegel Resigns From LNRS To Work For TLO/TransUnion

39.  On April 4, 2014, Spiegel notified LNRS via email that she had received an offer for a Product Manager position with TLO/TransUnion, one of LNRS's direct competitors. On April 7, 2014, LNRS responded to Spiegel via email, notifying her that accepting the Product Manager position with TLO/TransUnion would constitute a violation of the non-competition covenant in the Agreement.

40.  Despite this statement from LNRS, Spiegel resigned her employment with LNRS on May 9, 2014. Upon information and belief, Spiegel has accepted the Product Manager position with TLO/TransUnion and will work in TLO/TransUnion's Boca Raton office.

41.  TLO/TransUnion is a direct competitor of LNRS in the risk analytics services industry. Like LNRS, TLO/TransUnion offers risk analytics services with respect to fraud detection and prevention, identity verification and authentication, and debt recovery, and other product lines. Its products address the same types of business needs that are addressed by LNRS products. (*See* TLO/TransUnion's current website, copy attached hereto as Exhibit B.)

42. In particular, TLO/TransUnion's flagship product, TLOxp, competes directly with LNRS's Accurint product. Like LNRS's Accurint product, TLOxp is an investigative and risk management tool for due diligence, threat assessment, identity authentication, fraud prevention and detection, legislative compliance, and debt recovery. Similar to Accurint, TLOxp is comprised of public and proprietary records, and is used to locate and research connections between individuals, businesses and assets. Additionally, TLO/TransUnion and LNRS market their respective products to the same industries, including but not limited to the collections, legal, financial services, insurance, corporate risk, and private investigation industries, in addition to law enforcement and other government entities. (*See* Ex. B.)

43. Upon information and belief, Spiegel's new position at TLO/TransUnion will involve functions, duties, and responsibilities that are similar to those she performed for LNRS. In particular, as a Product Manager, Spiegel presumably will provide information and guidance to TLO/TransUnion's sales and marketing teams and perhaps its product design teams to optimize the product's performance in the market. In short, her responsibility will be the mirror image of her former role for LNRS: to maximize the success of the TLO/TransUnion product against LNRS and other competitors' products.

44. Spiegel has detailed and intimate knowledge of LNRS and competitor products because she was paid by LNRS for more than ten years to compile and analyze information about those products. Although information that she compiled about competitor's products generally came from public sources, neither the compilation nor the analysis of that information was public. Rather, the information was developed and disseminated internally for the sole benefit of LNRS sales and marketing employees to differentiate LNRS products, and for product

and design employees to improve and enhance the Company's products and to anticipate possible opportunities and vulnerabilities versus competitors' products.

45. In light of her position with TLO/TransUnion, it is inevitable and unavoidable that Spiegel will use and/or disclose LNRS's confidential, proprietary, and trade secret information for her own personal benefit and for the benefit of TLO/TransUnion, thereby causing LNRS irreparable harm. Her new position with TLO/TransUnion will require her, or at least will give her the motive, means, and opportunity, to utilize her intimate and detailed knowledge of LNRS confidential information, including but not limited to trade secrets, for the benefit of its competitor, TLO/TransUnion.

46. The likelihood of Spiegel's use of LNRS confidential information, including but not limited to trade secrets, does not depend on whether she is assigned to a manage a particular product or to focus on a particular industry at TLO/TransUnion. Her work at LNRS spanned numerous products and industries, and the deep and intimate knowledge she gained regarding LNRS products, methods, techniques, and processes transcends any particular niche.

47. Once TLO/TransUnion is able to assimilate and put to use the intimate and detailed competitive intelligence that Spiegel has developed, along with her deep knowledge of LNRS products and their strengths, weaknesses, opportunities, and vulnerabilities, LNRS will lose much of the value of the confidential information it has developed over more than a decade at substantial expense.

48. In a very competitive business that depends to a great extent on proprietary methods, techniques, and processes, it is clear that a leak of such information can and will substantially weaken LNRS's competitive advantages. Once TLO/TransUnion learns what makes LNRS products successful—e.g., what are the most effective data vendors, what are the

most effective data and why, and how are the data utilized within LNRS's products—presumably it can put that information to use and greatly diminish LNRS's relative position in the market.

## COUNT I
## (INJUNCTIVE RELIEF AGAINST SPIEGEL TO ENFORCE AGREEMENT)

49. LNRS repeats and re-alleges each and every allegation set forth in Paragraphs 1 through 48 above as if fully set forth herein.

50. Spiegel knowingly and voluntarily entered into a legally binding and enforceable Agreement with LNRS for which she was provided valuable consideration.

51. LNRS has performed each of its obligations under the Agreement, and all conditions precedent to LNRS's claims have been performed, occurred, or otherwise waived.

52. The Agreement contains a valid non-competition covenant, prohibiting Spiegel from engaging in business that is competitive to LNRS for a period of two years following Spiegel's termination or end of employment.

53. LNRS has identified one or more legitimate business interests, as recognized in Fla. Stat. § 542.335(b), that justify enforcement of the restrictive covenant, and the Agreement is otherwise enforceable under Fla. Stat. § 542.335.

54. Spiegel has materially breached the terms of the Agreement by, among other things, accepting employment with a competitor of LNRS within the prohibited time period and territory. Accordingly, LNRS has a substantial likelihood of success on the merits.

55. LNRS will suffer immediate and irreparable injury unless Spiegel is enjoined from unlawfully competing against LNRS and using, disclosing, or revealing LNRS's confidential information, including but not limited to LNRS's trade secrets.

56. In accordance with the terms of the Agreement and all applicable law, LNRS is entitled to preliminary and permanent injunctive relief to prevent Spiegel from violating the non-

14

competition covenant in the Agreement and from using or disclosing LNRS's confidential information, including but not limited to trade secrets.

57. If Spiegel's conduct is allowed to proceed unchecked, LNRS's confidential information, including but not limited to trade secrets, and its valuable relationships with its current and prospective customers will be irreparably lost and destroyed. LNRS has no adequate remedy at law to prevent this unlawful and unfair competition from continuing.

58. LNRS seeks the assistance of the equitable and legal powers of this Court to prevent this irreparable damage from continuing and occurring.

59. The balance of hardships favors the issuance of an injunction. As a direct and proximate result of Spiegel's breach of the Agreement, LNRS has suffered and will continue to suffer harm due to Spiegel's conduct. Among other things, LNRS stands to lose its competitive advantage against TLO/TransUnion and profits associated therewith if Spiegel uses or discloses LNRS's confidential information in her employment with TLO/TransUnion, which is inevitable and avoidable in light of her position with TLO/TransUnion and her numerous years of employment, education, training, and experience within LNRS. LNRS also stands to lose customers, distributors, and goodwill. Accordingly, the threatened injury to LNRS outweighs whatever damage the injunction may cause Spiegel.

60. Florida law favors the enforcement of valid restrictive covenants, and an injunction would not be adverse to the public interest.

61. LNRS therefore requests preliminary and permanent injunctive relief to prevent further violation of its rights, in addition to such other relief as is necessary and just.

## **PRAYER FOR RELIEF**

WHEREFORE, LNRS respectfully seeks a judgment in its favor and against Spiegel, and requests the Court to grant the following relief:

1. Enter judgment in favor of LNRS and against Spiegel on all counts;

2. Issue a preliminary injunction and permanent injunction restraining Defendant from the following:

   a. Violating any of the terms of the Agreement;

   b. Engaging in any business that is competitive to LNRS in the restricted territory for a period of two years;

   c. Destroying, erasing, or otherwise making unavailable for further proceedings in this litigation, any records or documents (including data or information maintained in computer media) in Spiegel's possession or control which were obtained from LNRS or contain information derived in any way from LNRS's records, which pertain in any way to LNRS's customers or business operations, or which relate in any way to the allegations in this Complaint;

3. Require Spiegel to return all LNRS property that remains in Spiegel's actual or constructive possession, including any confidential, proprietary, and trade secret information.

4. Award LNRS its attorneys' fees and costs pursuant to Fla. Stat. § 542.335(k), the Agreement, and other applicable law.

5. LNRS requests a trial by jury on all claims and issues so triable.

6. Award any such other and further relief as may be deemed just and proper.

Respectfully submitted, this \_\_\_17th\_\_\_ day of \_\_\_July\_\_\_, 2014.

*/s/ Scott G. Hawkins*
SCOTT G. HAWKINS
Florida Bar No. 0460117
shawkins@jones-foster.com
**JONES, FOSTER, JOHNSTON & STUBBS, PA**
Flagler Center Tower, Suite 1100
505 South Flagler Drive
West Palm Beach, Florida 33401
Telephone: (561) 650-0459
Facsimile: (561) 650-1454

and

W. CHRISTOPHER ARBERY
Georgia Bar. No. 021010
carbery@hagllp.com
**HALL, ARBERY, GILLIGAN,
ROBERTS & SHANLEVER LLP**
Tower Place 100, Suite 1900
3340 Peachtree Road, NE
Atlanta, Georgia 30326
Telephone: (404) 442-8778
Facsimile: (404) 537-5555

ATTORNEYS FOR PLAINTIFF

## **CERTIFICATE OF SERVICE**

I hereby certify that on 7/17/14, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will automatically send notice of such filing to the following attorneys of record.

Ronald D. Shindler
Luis S. Konski
Fowler White Burnett
1395 Brickell Avenue
14th Floor
Miami, FL 33131-3302

Stephen Bruce Rakusin
Rakusin Law Firm
2919 E. Commercial Boulevard
Fort Lauderdale, FL 33308

Sandra I. Tart
Fowler White Burnett
Northridge Center
515 N. Flagler Drive
Suite 2100
West Palm Beach, FL 33401

*/s/ Scott G. Hawkins*
Scott G. Hawkins

4851-6623-6956, v. 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

CASE NO.: 9:14-CV-80666-Hurley/Hopkins

LEXISNEXIS RISK SOLUTIONS FL INC.,

    Plaintiff,

v.

JACQUELYN SPIEGEL,

    Defendant.
_____/

## **VERIFICATION**

I, Mark Luber, hereby declare on behalf of LexisNexis Risk Solutions FL Inc. that I have personal knowledge or knowledge derived from records maintained in the ordinary course of business of the facts set forth in the Amended Verified Complaint, and that such information is true and correct. I declare under penalty of perjury that the foregoing is true and correct.

Executed on this __17__ day of July, 2014.

_____
Mark Luber
LexisNexis Risk Solutions FL Inc.